FILED'10 APR 20 14:33USDC-ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| JAMES W. REEVES, | ) | Civil No. 09-59-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| COMMISSIONER, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Karen Stolzberg
11830 S.W. Kerr Parkway, #315
Lake Oswego, OR 97035

    Attorney for Plaintiff

Kent S. Robinson
Acting U.S. Attorney
Adrian L. Brown
Asst. U.S. Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902

FINDINGS AND RECOMMENDATION - 1

Stephanie R. Martz
Special Asst. U.S. Attorney
Social Security Administration
701 5th Avenue, Suite 2900 M/S 901
Seattle, WA 98104-7075

   Attorneys for Defendant

JELDERKS, Magistrate Judge:

   Plaintiff James Reeves brings this action pursuant to 42 U.S.C. § 405(g) seeking

judicial review of a decision by the Commissioner of Social Security (the Commissioner)

denying his application for Supplemental Security Income benefits.  For the reasons set out

below, the Commissioner's decision should be reversed, and the action should be remanded

for a determination of disability and an award of benefits.


### Procedural Background

   Plaintiff filed an application for Supplemental Security Income (SSI) on August 11,

2003, alleging that he had been disabled since June 19, 2003.  The application was denied

initially and upon review.

   On December 28, 2005, a "Notice of Decision" was issued denying plaintiff's

application for benefits, and stating that plaintiff had elected to have a decision made without

an oral hearing.  Plaintiff appealed this decision to the Appeals Council, which on March 29,

2006, remanded the action to the Social Security Administration (the Agency) for further

proceedings because there was no record indicating that plaintiff had in fact elected to have a

decision issue without a hearing.

   On October 5, 2006, a hearing was held before Administrative Law Judge (ALJ)

Ralph Jones.  On  November 1, 2006, ALJ Jones issued a decision finding that plaintiff was

FINDINGS AND RECOMMENDATION - 2

not disabled within the meaning of the Social Security Act (the Act). That decision became the final decision of the Commissioner on November 11, 2008, when the Appeals Council denied plaintiff's request for review on the grounds that new evidence it had been provided did not "provide a basis for changing the Administrative Law Judge's decision."

On February 5, 2008, before the Appeals Council denied plaintiff's request for review of the application at issue here, plaintiff filed a second application for SSI benefits. Pursuant to that application, plaintiff was found to be disabled. In its November 11, 2008 decision denying plaintiff's request for review of the application at issue here, the Appeals Council noted that plaintiff had been "found to be under a disability beginning February 5, 2008, based upon the application(s)" plaintiff had filed on February 5, 2008. The Appeals Council concluded that "this information does not warrant a change in the Administrative Law Judge's decision," which "decided [the] case through November 1, 2006."

In the present action, plaintiff challenges the Commissioner's conclusion that he was not disabled based upon the application filed on August 11, 2003.


### Factual Background

Plaintiff was born on September 19, 1953, and was 53 years old at the time of the ALJ's decision. He graduated from high school and attended college for two years. Plaintiff has past relevant work experience as a general contractor and a carpenter. Plaintiff was injured during an assault on June 19, 2003, and alleges that he has been disabled since that time because of pain, dizziness, poor memory, a brain bleed, broken ribs, a bad shoulder and knee, and a broken jaw.

### Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One. The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two. 20 C.F.R. § 404.1520(b).

Step Two. The Commissioner determines whether the claimant has one or more severe impairments. A claimant who does not have such an impairment is not disabled. If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three. 20 C.F.R. § 404.1520(c).

Step Three. Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled. If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

Step Four. The Commissioner determines whether the claimant is able to perform work he or she has done in the past. A claimant who can perform past relevant work is not disabled. If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.

20 C.F.R. § 404.1520(e).

Step Five. The Commissioner determines whether the claimant is able to do any other work. A claimant who cannot perform other work is disabled. If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do. The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled. If the Commissioner does not meet this burden, the claimant is disabled. 20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant. Tackett, 180 F.3d at 1098. At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. Id.

## Medical Record

Plaintiff was hospitalized in Kansas City, Missouri, on June 20, 2003, after being assaulted by three men with an unknown object. A CT scan showed areas of intracranial hemorrhage and multiple jaw fractures. The jaw was repaired with plates. There was also evidence of bibasilar atelectasis with possible pulmonary contusion in both lung bases. Plaintiff was discharged on June 23, 2003, and later returned to Portland, Oregon, where he lives.

After returning to Portland, plaintiff was seen at the emergency room of a local hospital several times for complaints related to the assault. He was seen for knee pain with a

menisus tear; post concussion syndrome; headache; anxiety; and right shoulder pain, which was diagnosed as degenerative disease of the acromioclavicular joint (acromioclavicular arthorosis).   Notes from a visit to Dr. Koznek on July 22, 2003, indicate that plaintiff's left knee was warm and swollen, and had a slightly decreased range of motion.  On August 5, 2003, Dr. Koznek indicated that plaintiff complained of pain in his left knee, right shoulder, and jaw.  Notes indicate that plaintiff spoke slowly, seemed "intermittently befuddled," and expressed concern that his regular doctor would not continue to provide him pain medications.  Dr. Koznek indicated that plaintiff's left knee was unstable, and stated that plaintiff remained intact neurologically.  She added that she had concerns that "some abnormal behaviors existed prior to the described assault," and that there appeared to be "some preoccupation with pain medication at this late date."

In her notes of a visit on August 28, 2005, Dr. Koznek indicated that plaintiff's significant other, Ms. McCauley, reported that plaintiff had had an episode of rage.  Plaintiff complained of severe pain in his shoulder, and had been "taking the narcotics in larger doses than prescribed."  Dr. Koznek opined that plaintiff's consumption of medications might be slowing his speech and function.  She diagnosed anxiety/depression, a controlled cerebral hemorrhage, plated mandibular fractures, and cartilage damage to plaintiff's left knee. Dr. Koznek suspected that plaintiff might also have a cervical fracture, and asked Ms. McCauley to dispense plaintiff's medications.

An MRI of plaintiff's brain taken on August 25, 2003, was essentially negative "except for mild microvascular ischemic changes within the cerebral white matter."

Plaintiff had an arthroscopic meniscectomy on September 24, 2003, and his external mandible hardware was removed without complications on December 19, 2003.

Plaintiff began seeing Dr. Krisin Kocher in January, 2004.  Chart notes indicate that plaintiff had repeated complaints of headache, jaw pain, and depression.  He was agitated at times, and reported passing out a couple of time per month.  In chart notes dated January 28, 2004, Dr. Kocher indicated that plaintiff's depression was worsening, and noted that plaintiff was taking 8 oxycodone tablets a day, which was a decrease from earlier usage.  Plaintiff reported that he had difficulty getting out of bed in the morning, and complained of pain, stiffness, and dizzy spells.  He was seen in an emergency room for increasing sadness and depression.

In February, 2004, Dr. Brett Stacey at the OHSU Pain Management Center indicated that plaintiff had some neuro-deficits in the left temporal region and temporomandibular joint discomfort, memory loss and thought processing problems, myofascial pain in the cervical region left greater than right possibly secondary to recent jaw surgery, sleep disturbance due to pain, a great deal of depression and anxiety, with possible posttraumatic stress disorder, and personality changes with increased anger and agitation.  Dr. Stacey noted that plaintiff complained of idiopathic dizzy spells and a loss of consciousness once or twice a month. He also noted that plaintiff had "a great deal of gait dysfunction and balance difficulties," and opined that plaintiff "may have some internal inflammation/swelling of the brain."

On February 23, 2004, plaintiff was admitted to the Hooper Detoxification Center to detox from a variety of medications.  He was discharged on February 27, 2004.

Plaintiff was evaluated by Caleb Burns, Ph.D., on May 25, 2004.  Dr. Burns interviewed plaintiff and administered a series of psychometric tests.  Plaintiff told Dr. Burns that he had a long history of alcohol abuse, which had "ruined a good part"of his life, and that he last used alcohol before he went to work in Kansas.  Plaintiff reported that he had ongoing

pain in his head, right arm, shoulder, and left knee since the assault. He reported losing consciousness for a minute or two on occasion, and complained of poor balance and numbness in his face. Plaintiff said that his memory was very poor. Dr. Burns noted that plaintiff walked slowly and gingerly, avoided eye contact at times, and did not know the day and month of the interview, though he knew the day of the week, the year, and the season. Dr. Burns stated that plaintiff was cooperative, appeared to be motivated, and showed no signs of exaggeration or malingering. His affect was sober to somewhat distressed.

Dr. Burns found no indications of auditory or visual hallucinations. Plaintiff's attention and concentration appeared to be reasonably good, but his hearing was very poor. His insight and judgment also appeared to be reasonably good.

Dr. Burns concluded that plaintiff's tests scores were valid. He achieved "borderline" scores in the verbal, performance, and full scale intelligence tests on the WAIS III, and his scores on the Wechsler Memory Scale III test indicated "significant memory deficits." Dr. Burns opined that plaintiff's significant memory problems were caused by his severe closed head injury. MMPI validity scores indicated that test results were probably valid. The Mood Assessment Scale suggested severe depression, and Dr. Burns diagnosed an adjustment disorder with depressed mood, with substantial memory deficits caused in large part by the assault in 2003. Dr. Burns concluded that plaintiff had "substantial memory deficits as well as chronic pain and physical limitations and a possible history of seizures." He opined that, while plaintiff's psychological problems alone "would not necessarily preclude employment, it is going to be very difficult for him to find an employment situation which he can adequately fill, given his physical problems, his hearing difficulties, his memory deficits, etc." Dr. Burns added that a physician rather than a psychologist like himself would be better

able to determine the effect of plaintiff's physical problems. Dr. Burns assigned plaintiff a Global Assessment of Functioning (GAF) score or 57.

Dr. Richard Rosenbaum, a neurologist, saw plaintiff for his complaints of dizziness, headaches, and depression. In a letter dated October 10, 2003, Dr. Rosenbaum noted that plaintiff had experienced episodes of loss of consciousness, but that his EEGs had been negative twice for seizures. He stated that plaintiff had persistent post-traumatic symptoms. In a letter dated February 12, 2004, Dr. Rosenbaum stated that plaintiff experienced recurrent vertigo and recurrent episodes of loss of consciousness, and had headaches almost every day. On examination, he noted mild right facial weakness and synkinesia, and reported that plaintiff's tandem gait was unsteady, and that he was unable to walk in place with his eyes closed. Dr. Rosenbaum opined that plaintiff's loss of consciousness probably represented "syncope secondary to pain or vertigo rather than a seizure . . . ."

Dr. Rosenbaum completed a Physical Residual Functional Capacity Report on September 1, 2004. Dr. Rosenbaum opined that plaintiff could lift/carry 20 pounds occasionally, could stand at least 2 hours during an 8-hour work day, needed to periodically alternate sitting and standing in order to relieve pain and discomfort, was limited in his ability to push or pull in the upper extremities because of pain in his right shoulder, and was limited in his lower extremities by knee pain. He indicated that plaintiff should never climb, balance, stoop, kneel, crouch, or crawl, and could frequently reach with his left shoulder, but not with his right shoulder. Dr. Rosenbaum imposed no environmental restrictions, but indicated that plaintiff needed to avoid all exposure to hazards, machinery, and heights because of his posttraumatic headache and vertigo. He stated that these limitations had existed since June 14, 2003.

FINDINGS AND RECOMMENDATION - 9

In notes dated August 3, 2005, Dr. Rosenbaum indicated that plaintiff suffered from chronic headache, dizziness, and facial weakness, as well as depression. He also noted leg numbness, with a history of claudication and lateral femoral cutaneous neuropathies.

Lumbar X-rays taken on January 9, 2006, showed mild spurring on L2, L3, and L4, and narrowing and spurring on the L5-S1 facet joints. No abnormality was seen on the sacrum and SI joints.

Plaintiff began seeking mental health treatment at Cascadia Behavioral Healthcare (Cascadia) in August, 2004. Notes from Cascadia dated June 1, 2006, show that plaintiff complained of depression, suicidal and homicidal ideation, intermittent psychotic symptoms, intrusive thoughts, anxiety, hyper vigilance, and problems with anger management. Plaintiff was diagnosed with Major Depressive Disorder, recurrent, severe, with psychotic features; Posttraumatic Stress Disorder, chronic; and Chronic Pain. His GAF was rated as 41. Notes dated June 27, 2006, indicate that plaintiff reported that he had recently undergone a neuropsych evaluation "from a PhD who he described as very rude to him." Plaintiff reported that the doctor was annoyed with him, which increased his stress level, and that "he heard voices telling him to jump off the Fremont bridge."

At the request of the Agency, Elaine Grief, Ph.D., evaluated plaintiff on June 20, 2006. Dr. Grief reviewed plaintiff's records, interviewed plaintiff, and administered a series of tests. These included the WAIS-III, the WMS-III, Trail-Making tests, an Aphasic Screening test, the MMPI-2, and "validity tests," including the Test of Memory Malingering (TOMM). She diagnosed Malingering; R/O Cognitive disorder NOS; R/O Adjustment Disorder with Depressed Mood; and Alcohol Dependence, reportedly in sustained full remission. Dr. Grief noted that case reviews of plaintiff's records "note that his reports were

unreliable, and inconsistent." She added that "[t]he credibility of his reports was questioned." Dr. Grief opined that plaintiff has the ability to understand, remember, and carry out short, simple instructions, and that his ability to make simple judgments was unimpaired. She stated that she could not offer an opinion regarding his abilities to respond to supervisors, co-workers, or changes in work settings because his test results were not reliable.

On June 27, 2006, plaintiff's counselor, Susan Sotka, CSW, requested a copy of Dr. Grief's neuropsych report. Ms. Sotka shared the report with plaintiff on July 26, 2006, and reported that plaintiff was angry, but resigned to the idea that his application for disability benefits might be denied. Deborah Young, PMHNP, who prescribed medications for plaintiff at Cascadia, also discussed Dr. Grief's report with plaintiff, who was "devastated" by the report. Young and Sotka disagreed with Dr. Grief's report.

Young and Sotka wrote a letter dated October 2, 2006, concerning plaintiff's psychological conditions. They indicated that plaintiff had chronic symptoms of PTSD, including anxiety, nightmares, intrusive thoughts, and hypervigilance, following his assault in 2003. They noted that plaintiff had been diagnosed with Major Depressive Disorder, Recurrent, Severe, with Psychotic Features, and Posttraumatic Stress Disorder, Chronic. Young and Sotka opined that, because of his symptoms, plaintiff had been unable to work since the assault. They indicated their disagreement with Dr. Grief's assessment, noting that they had worked with plaintiff for more than two years. Young and Sotka stated that plaintiff

> has worked hard on learning to live with his numerous disabilities, trying to learn new coping skills, and accessing treatment with little support. We feel strongly that the severity of his symptoms and mental illness alone render Mr. Reeves totally disabled, and unable to engage in any substantial gainful employment.

In a letter dated August 1, 2007, Dr. Neil Falk, Associate Medical Director at Cascadia, indicated that he had read the letter written by Young and Sotka, and "confirm[ed] that the letter and corresponding report are appropriate and accurate in the information contained."

Clifford Coleman, MD, MPH, became plaintiff's primary care physician in January, 2006. In a letter dated October 3, 2006, Dr. Coleman stated that plaintiff

> suffers from a number of chronic physical and mental conditions, which severely limit his ability to function effectively in society. These include a history of traumatic brain injury as a result of a reported assault, with resultant post traumatic stress disorder, as well as major depression, memory loss and chronic right knee pain, which requires long-term narcotic therapy. This constellation of problems renders Mr. Reeves functionally disabled in my opinion. I do not believe that he will be able to obtain or maintain meaningful employment.

On January 7, 2008, plaintiff was admitted to OHSU because of reported homicidal ideation. The admitting doctor noted serious concern about plaintiff's safety and the safety of others, and diagnosed plaintiff with homicidal ideation, hallucinations, schizophrenia, and PTSD.

Notes from Cascadia dated January 24, 2007, indicate that plaintiff had been involved in a "verbal altercation" with "safety staff" at the Cascadia clinic. Plaintiff reported that he had assaulted someone at an AA meeting six months earlier.

On March 31, 2007, plaintiff again went to the OHSU emergency room. Plaintiff complained of suicidal and homicidal ideation, and reported hearing voices telling him to jump off the Fremont bridge. It was determined that he was a threat to himself, and he was placed on hold and admitted. Plaintiff was "oriented as to place but not month, but knew the season." His attention span and concentration were poor, and insight and judgment were deemed to be "fair." Plaintiff was discharged on April 3, 2007.

FINDINGS AND RECOMMENDATION - 12

In a letter to plaintiff's counsel dated August 30, 2007, Dr. Coleman set out his opinions concerning plaintiff's symptoms and limitations more fully. Dr. Coleman restated plaintiff's diagnoses, and opined that many of his diagnoses are chronic, and are, even individually, disabling. He added that, when these were considered in combination, "he certainly meets criteria for permanent disability." Dr. Coleman stated that the medications used to treat plaintiff's conditions, "including opioid and psychotropic medicines, have a variety of side effects, including slowed cognition, which may be expected to further impair his ability to function consistently in an employment setting." He opined that plaintiff could perform only about four hours of light activity before he needed a nap, and noted that plaintiff's medications likely contributed to his overall fatigue. Dr. Coleman opined that plaintiff would likely miss work more than two days per month because of his impairments. He noted that plaintiff had been hospitalized for "mental health decompensation in the past, including recently," and that he had experienced a period of decompensation lasting two weeks following a verbal altercation with a security guard at Cascadia.

## **Hearing Testimony**

1. Plaintiff's Testimony

Plaintiff testified as follows at the hearing before the ALJ.

Plaintiff has serious headaches two to three times a week. Though Vodin takes the edge off, it does not stop the pain. The headaches last from a few minutes to a few hours, and plaintiff goes to the hospital if the pain is unbearable.

Plaintiff also has pain in his leg, and must sit on the edge of the bed before he can stand and walk. He has had surgery on both knees and on his right shoulder, and his legs go

FINDINGS AND RECOMMENDATION - 13

numb.  Plaintiff has no feeling in his right hand, and has poor eye-hand coordination.  He is never free of pain, and he suffers from anxiety.  Being around groups of people makes him anxious, and he has been afraid of groups of men since he was assaulted.

Plaintiff has hallucinations, and sometimes has conversations with people who aren't present.  Voices tell him to jump off the Fremont bridge.  He has difficulty remembering things, and often forgets his medications.  On a good day, he can walk about a half a block. He spends a lot of his time sitting or lying down.

2. Testimony of Kim McCauley

Ms. McCauley has been plaintiff's friend for many years.  Though she and plaintiff were once involved in a romantic relationship, she is more a caretaker now.  Plaintiff lives in her home, which is a transition house for recovering alcoholics.

Plaintiff could do anything before he was injured.  Now he cannot accomplish anything.  Ms. McCauley has considered putting plaintiff in an assisted living facility because he cannot be left alone.  He forgets things that he leaves on the stove, and often injures himself.  Plaintiff suffers from severe anxiety and depression, is uncomfortable in groups, hallucinates, and hears things that are not there.  He cannot follow conversations, sleeps a lot, and is sad.  Ms. McCauley has taken plaintiff to the emergency room several times because of his anxiety.

Plaintiff went to Kansas City to work on property owned by some friends from Portland.  When he first returned following the assault there, he passed out often.  He consulted with many doctors, and became addicted to the many painkillers that were prescribed.  Plaintiff overdosed several times, and was fired by two doctors because of drug

seeking behavior.  Since he went through the detox program at the Hooper center, there is no

sign that he has been abusing drugs.  Plaintiff has been sober since the assault.

Plaintiff no longer passes out frequently.  He has trouble getting in and out of the

shower, and often will go for days without showering.  He has trouble walking after getting

out of bed in the morning.  Plaintiff has frequent anxiety attacks.  He does very little during

the day, and it takes him months to complete very minor projects.  Plaintiff's thinking is never

clear, and he is never free of pain.  When he does household chores, he forgets what he is

doing and wanders off after a few minutes.  Plaintiff is confused, and cannot maintain his

focus long enough to read.

3. VE's Testimony

The Vocational Expert testified that plaintiff's past relevant work included work as a

general contractor, which was a light, skilled position.  In carrying out that work, plaintiff had

also worked as a carpenter, which is a medium, skilled position.

The ALJ posed a hypothetical describing a 49 year-old individual with a 12th grade

education, and plaintiff's work experience.  The described individual could perform

"essentially without limitations except for no exposure to hazards, as far as physical

assessment is concerned."  As to mental characteristics, the ALJ described an individual who

was "capable of remembering, understanding, and carrying out simple one, two, three-step

instructions, maintaining concentration for simple pace routines with regular breaks and

supervision, able to get along with coworkers and supervisors, do best without or with

limited public contact, able to respond to work changes with no significant limitations."  The

VE testified that such an individual could not perform plaintiff's past relevant work, but could

work at a variety of assembly types of positions, including small parts assembly.  The VE

testified that the described individual could also perform laundry work or work as a cleaner/packager of electronics products.

In response to further questioning by the ALJ, the VE testified that an individual who could not leave the house on a regular basis, could sit or stand for a maximum of 20 to 30 minutes before needing to lie down, and could not concentrate "for any length or period of time" could not perform these jobs.

## Lay Witness Statements

### 1. Kari McKinley

Kari McKinley, an RN who has worked in a psychiatric ward, lives in plaintiff's household. She has observed that plaintiff's fine motor skills and speech are slowed. Ms. McKinley reported that plaintiff's thoughts appeared to be jumbled, and that his movements were sometimes retarded. Sometimes plaintiff could not complete simple tasks, and needed to be looked after by other members of the household.

### 2. Cynthia Mouridian

Ms. Mouridian had lived in plaintiff's household for more than two years. She had seen a marked decline in plaintiff's ability to communicate during that time. Plaintiff could not stay on a topic, and became confused and incoherent. He could not cook because he was confused and frustrated. Plaintiff's mental state and general physical health had declined.

### 3. Joyce Roberson

Ms. Roberson, who also lived in plaintiff's household, reported that plaintiff seemed to constantly struggle with pain, and sometimes stayed in bed most of the day. She also stated that plaintiff sometimes imagined things that were not happening.

### 4. Jonathan Akers

Mr. Akers reported that he had known plaintiff for 18 years, and had worked with him for many years. He stated that plaintiff was a hard worker until he returned from Kansas City, and that his life had changed drastically since that time. Mr. Akers stated that plaintiff had difficulty dealing with everyday issues, and could not complete menial tasks. He described plaintiff as lacking direction, fearful, and in constant need or reminders to stay on task. He also reported that plaintiff had difficulty climbing stairs, walking, and standing.

### 5. Evelyn Baker, RN

Nurse Baker stated that she had known plaintiff for four years. She stated that he seemed to be in pain much of the time, was forgetful, sometimes had difficulty following through on projects, and seemed to have problems staying on task.

### 6. Andy Baker

Andy Baker stated that he had known plaintiff for four years, and had known him before he was assaulted. Mr. Baker stated that plaintiff suffered mentally and physically, had difficulty putting thoughts together, and had disjointed conversations. He reported that plaintiff was often incapable of being social, forgot appointments, was immobilized by pain at time, and experienced many mood swings. Mr. Baker characterized plaintiff as a "fraction of the person" he had met in 2002.

FINDINGS AND RECOMMENDATION - 17

**ALJ's Decision**

At the first step of his disability analysis, the ALJ found that plaintiff had not engaged in substantial gainful employment since the date of the alleged onset of his disability.

At the second step, the ALJ found that plaintiff had a post-concussive syndrome, a depressive disorder, and a substance addiction disorder, and that these constituted "severe" impairments within the meaning of the Act.

At the next step of his analysis, the ALJ found that these impairments, either alone or in combination, did not meet or equal one of the "listed impairments" in 20 C.F.R. Part 404 P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926).

The ALJ found that plaintiff had the residual functional capacity required to perform simple, routine work, could get along with coworkers, but should have limited public contact. Based upon this functional analysis and upon the testimony of the VE, he concluded that plaintiff could not perform his past relevant work, but could work as an assembler, a laundry worker, or a cleaner/packager. Accordingly, he found that plaintiff was not disabled within the meaning of the Act.

In reaching his conclusion as to plaintiff's residual functional capacity, the ALJ found that plaintiff's description of his symptoms and limitations was not wholly credible. In addition, though he found that the lay witnesses were credible, he concluded that "behavior exhibited or symptoms reported by a subject are not an adequate basis to establish disability." The ALJ also found it "interesting to note that four out of the five narratives are notarized by the claimant's long-term girlfriend, Kim McCauley." The ALJ added that Ms. McCauley's testimony was of limited use because "[s]he is not trained to critically evaluate whether the claimant's complaints are exaggerated or inconsistent with objective evidence," and that she

"has no demonstrated vocational expertise necessary to support a conclusion the claimant is unable to work."

## Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

## Discussion

Plaintiff contends that the ALJ erred in rejecting the opinions of his treating health care providers, in finding that he was not credible, in failing to "defer to" lay testimony in the record, and in posing a hypothetical to the VE that did not include all of plaintiff's impairments.

1. ALJ's Evaluation of Opinions of Treating and Examining Doctors and Other Sources

a. Applicable standards

Because treating physicians have a greater opportunity to know and observe their patients, their opinions are given greater weight than the opinions of other physicians. Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989). Accordingly, an ALJ must support the rejection of a treating physician's opinion with "findings setting forth specific and legitimate reasons for doing so that are based on substantial evidence in the record." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). An ALJ must provide clear and convincing reasons for rejecting a treating physician's uncontroverted opinions. Lester v. Chater, 81 F.2d 821, 830-31 (9th Cir. 1995).

The opinion of an examining physician is entitled to greater weight than the opinion of a non-examining physician. Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ must provide clear and convincing reasons for rejecting the uncontradicted opinions of an examining physician, id., and must provide specific and legitimate reasons that are supported by substantial evidence in the record for rejecting an examining physician's opinion that is contradicted by another physician. Andres v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995).

Evidence from "acceptable medical sources" such as doctors is required to establish a claimant's medically determinable impairments. 20 C.F.R. 404.1502; 1513(a); (d). However, "other medical sources" such as nurses and licensed social workers may offer opinions regarding a claimant's symptoms, diagnosis, and prognosis, and opinions as to what a claimant can still do despite his impairments. Social Security Ruling (SSR) 06-03p. In evaluating the opinions of "other medical sources," the following factors are to be considered: 1) how long the source has known the claimant and how frequently the source has seen the claimant; 2) whether the opinion is consistent with other evidence; 3) the degree to which the source presents relevant evidence supporting an opinion; 4) how well the source explains the opinion; and 5) whether the source has a specialty or area of expertise related to the claimant's impairment(s).

b. Analysis

The opinions of Dr. Coleman and Dr. Rosenbaum, PMHNP Young and LCSW Sotka are fully set out above, and will be summarized only briefly here. Dr. Coleman, plaintiff's treating physician, opined that plaintiff's significant mental and physical impairments, including a traumatic brain injury, post traumatic stress disorder, major depression, memory loss, and chronic knee pain would cause plaintiff to miss more than two days of work per month, and rendered plaintiff functionally, permanently disabled. Dr. Rosenbaum, a neurologist, characterized plaintiff's post-traumatic symptoms as "persistent," and detailed his significant physical limitations. Dr. Rosenbaum opined that plaintiff could stand only 2 hours during an 8-hour work day, needed to periodically alternate sitting and standing, had a limited ability to push or pull, should never climb, balance, stoop, kneel, crouch, or crawl,

and needed to avoid all exposure to hazards, machinery, and heights because of his vertigo. The ALJ did not include these limitations in his assessment of plaintiff's residual functional capacity.  PMHNP Young and LCSW Sotka are "other medical sources" who worked with plaintiff for more than two years.  They noted plaintiff's significant mental diagnoses, and opined that plaintiff had been unable to work since he was assaulted in 2003.  Dr. Neil Falk, Associate Medical Director at Cascadia, opined that this assessment was accurate.

   The ALJ rejected the opinions of Drs. Rosenbaum and Coleman on the grounds that they relied too heavily upon plaintiff's subjective reports, which were not credible.  He also asserted that Dr. Coleman's opinion was vague, did not set out limitations, and concerned the ultimate question of disability, which is an issue reserved to the Commissioner.  The ALJ asserted that the treatment notes and assessments from nurse practitioners and social workers like Sotka and Young, "without concurrent review and signature from a medical doctor," are not considered to be from "acceptable medical sources," and are not entitled to the weight accorded "reports from acceptable medical sources."  He added that "much of the information" Sotka and Young relied upon in making their assessments came from plaintiff's "subjective reports without any objective corroboration, and they seemed to uncritically accept as true most, if not all, of what plaintiff reported."  The ALJ added that there were "good reasons for questioning the reliability of the claimant's subjective complaints," and noted that he gave the opinions of Sotka and Young "very little weight in determining the claimant's residual functional capacity."

   A careful review of the voluminous medical record does not support the ALJ's rejection of these opinions.  In asserting that these sources relied too heavily upon plaintiff's own subjective description of his symptoms and limitations, the ALJ assumed that these

professionals completely abandoned their training and objectivity and simply relied upon plaintiff's own characterization of his impairments, symptoms, and limitations.   However, the medical records are not consistent with the ALJ's interpretation of these sources' analyses. Dr. Rosenbaum and Dr. Coleman cited objective medical evidence for the impairments they noted and upon which they based their conclusions concerning the severity of plaintiff's limitations.   These doctors performed objective medical tests, and had ample opportunity to objectively observe plaintiff's behavior and the effects of the many medications that were prescribed.   Their diagnoses were consistent with those of most of the other "acceptable medical sources" who either examined or treated plaintiff.   Their opinions as to his functional capacity are consistent with a number of other medical opinions cited in the background above, and the limitations they assessed are consistent with the many severe impairments with which plaintiff has been diagnosed.   Objective physical and mental evidence supported the conclusion that plaintiff was as severely impaired as these doctors indicated, and there is no objective basis for concluding that these treating physicians uncritically accepted all of plaintiff's descriptions of his impairments.

As noted above, Dr. Grief, an examining psychologist, opined that plaintiff was a malingerer, that he had the ability to understand, remember, and carry out short, simple instructions, and that his ability to make simple judgments was unimpaired.   This is the only opinion that I have found in the substantial medical record that is inconsistent with the opinions of Dr. Coleman and Dr. Rosenbaum concerning the severity of plaintiff's mental impairments, and it is the only opinion that plaintiff was a malingerer.   Though Dr. Grief did not reach the issue of plaintiff's physical limitations, her malingering diagnosis provides some support for the assertion that plaintiff's physical impairments were not as serious as plaintiff

described them. Given this contradictory opinion, the ALJ was required to provide "specific and legitimate" reasons for rejecting the opinions of Dr. Rosenbaum and Dr. Coleman which were based upon "substantial" evidence in the record.

The ALJ's reasons for rejecting the opinions of these medical sources does not satisfy these requirements. As noted above, the opinions in question are fully consistent with the great weight of the medical record, and are based upon objective medical evidence and the observations of treating physicians who had the opportunity to examine, observe, and treat plaintiff over significant periods of time. As discussed briefly below, I conclude that the ALJ provided sufficient support for his conclusion that plaintiff's description of his impairments and limitations was not wholly credible. However, a careful reading of the medical record supports the conclusion that the medical sources who concluded that plaintiff's impairments significantly interfered with his ability to perform work activity did not base their opinions solely upon plaintiff's subjective complaints, but relied upon their objective clinical observations. Even if it were assumed that plaintiff at times exaggerated his condition, there was ample evidence that plaintiff's impairments severely limited his ability to function, and there is no support for the conclusion that the medical sources in question failed to objectively assess plaintiff's impairments.

When an ALJ provides inadequate reasons for rejecting the opinion of a treating or examining physician, that opinion is credited as a matter of law. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). A reviewing court then has discretion to remand the action for further proceedings or for a finding of disability and an award of benefits. See, e.g, Stone v. Heckler, 761 F.2d 530, 533 (9th Cir. 1985). Whether an action is remanded for an award of benefits or for further proceedings depends on the likely utility of additional proceedings.

FINDINGS AND RECOMMENDATION - 24

Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000). A reviewing court should credit the evidence and remand for a finding of disability and an award of benefits if: 1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; 2) there are no outstanding issues to be resolved before a determination of disability can be made; and 3) it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence in question were credited. Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).

Here, the ALJ did not provide legally adequate reasons for rejecting the opinions of the medical experts who evaluated his mental and physical impairments. There are no outstanding issues to be resolved before a determination of disability can be made, and it is clear that, if the opinions of Dr. Coleman and Dr. Rosenbaum had been credited, a finding of disability would be required. Under these circumstances, the action should be remanded for a determination of disability and an award of benefits based upon the application at issue in this action.[1]

The ALJ also provided inadequate reasons for rejecting the conclusions of "other sources" Sotka and Young. These professionals had the opportunity to observe and interact with plaintiff many times over a two-year period, and a review of relevant chart notes does not support the conclusion that they uncritically relied upon plaintiff's own reports concerning the severity of his impairments. The opinions of Sotka and Young concerning plaintiff's mental condition were consistent with most of the medical evidence, except for the assessment of Dr. Grief, an examining doctor. The ALJ's rejection of these opinions without

---

[1]As noted in the procedural background above, while the present application was pending before the Appeals Council, plaintiff was awarded benefits based upon an application filed on February 5, 2008.

a sufficient basis provides further support for the conclusion that this action should be remanded for an award of benefits.

## 2. ALJ's Assessment of Plaintiff's Credibility[2]

Plaintiff contends that the ALJ erred in finding that he was not wholly credible. For the reasons set out below, which do not alter my conclusion that the Commissioner's decision should be reversed, I disagree.

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). If a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony concerning the severity of symptoms merely because it is unsupported by objective medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) citing Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1990)(en banc). Unless there is affirmative evidence that the claimant is malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Id., quoting Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).

An ALJ rejecting a claimant's testimony may not simply provide "general findings," but instead must identify the testimony that is not credible and the evidence that undermines the claimant's complaints. Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). In addition, SSR 96-7 requires an ALJ to consider the entire record and to consider several factors, including the claimant's daily activities, medications taken and their effectiveness, treatment

---

[2]My conclusion that this action should be reversed for the reasons set out above makes it technically unnecessary to reach the balance of plaintiff's arguments. Nevertheless, in order to create a full record for review, I will briefly address the remaining issues.

other than medication, measures other than treatment used to relieve pain or other symptoms, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms."

Here, there was objective medical evidence that plaintiff's impairments would cause some degree of symptoms. However, there was evidence of malingering, which is found in Dr. Grief's assessment. Accordingly, though the Commissioner asserts that the ALJ provided clear and convincing reasons for finding plaintiff was not fully credible, he was not required to do so.

The ALJ found that plaintiff was not wholly credible based upon what he characterized as significant inconsistencies in the record, a lack of objective medical evidence supporting plaintiff's complaints, noncompliance with pain medication which exacerbated plaintiff's mental impairment, lack of complete candor in plaintiff's reports concerning his assets and earnings, Dr. Grief's finding of malingering, activities of daily living that were sometimes inconsistent with plaintiff's allegations of severely limiting symptoms, and plaintiff's assertion that he "deals with" his physical problems.

Based upon a careful review of the record, I conclude that some of these reasons are supported by the record, and that, given Dr. Grief's finding of malingering, these reasons are sufficient to discount plaintiff's credibility. Some of the ALJ's reasons are deficient. As noted above, I conclude that objective medical evidence does support plaintiff's complaints, and the Commissioner concedes that the ALJ erred in finding that plaintiff's addiction to narcotic pain medication supported the conclusion that plaintiff was not credible. In addition, plaintiff's assertion that he "deals with" his physical problems is not inconsistent with his description of those problems as severe and disabling, given that an individual may have little

FINDINGS AND RECOMMENDATION - 27

choice but to "deal with" physical problems, regardless of their severity.  There is no

evidence that plaintiff said that he could "deal with" his physical problems in a way that

allowed him to perform substantial gainful activity.  However, the ALJ's assertion that

plaintiff made inconsistent statements concerning his assets and his sobriety is supported by

the record, as is Dr. Grief's finding of malingering, which was based, at least in part, on

objective mental testing.  Under these circumstances, the ALJ's credibility determination was

sufficiently supported.


3. ALJ's Assessment of Lay Testimony

        As noted above, the ALJ concluded that Ms. McCauley's testimony was of limited use

because "[s]he is not trained to critically evaluate whether the claimant's complaints are

exaggerated or inconsistent with objective evidence," and that she "has no demonstrated

vocational expertise necessary to support a conclusion the claimant is unable to work."

Though the ALJ found that the other lay witnesses were credible, he concluded that "behavior

exhibited or symptoms reported by a subject are not an adequate basis to establish disability."

The ALJ also found it "interesting to note that four out of the five narratives are notarized by

the claimant's long-term girlfriend, Kim McCauley."

        I agree with plaintiff's contention that the ALJ did not provide adequate reasons for

discounting the lay testimony.  Friends are often in a position to observe a claimant's

symptoms and daily activities, and are competent to testify as to a claimant's condition.

Dodrill v. Shalala, 12 F.3d 915, 918-19 (9th Cir. 1993).  Eyewitnesses can often determine

whether an individual is suffering or malingering, and an ALJ must provide reasons that are

germane for discounting the testimony of each lay witness.  Id.  The Commissioner has

cited, and I have found, no authority for the proposition that lay testimony may be properly

discounted because the witness has "no demonstrated vocational expertise" or is not "trained

to critically evaluate" whether a claimant is exaggerating his complaints. Indeed, individuals

with such training cannot be fairly characterized as "lay witnesses" at all, and discounting

the testimony of all who lack such training would effectively eliminate lay witness

testimony. In addition, the question is not whether the "symptoms reported by a subject" are

sufficient to establish disability, but whether the observations of a lay witness contribute to

an understanding of the claimant's impairments and limitations. The ALJ's observation that

Ms. McCauley had notarized a number of the witness statements provides no basis for

discounting the accuracy of the evidence.


4. Adequacy of ALJ's Hypothetical

        In order to be accurate, an ALJ's hypothetical to a VE must set out all of the

claimant's impairments and limitations. E.g., Gallant v. Heckler, 753 F.2d 1450, 1456 (9th

Cir. 1984) (citing Baugus v. Secretary of Health and Human Services, 717 F.2d 443, 447 (8th

Cir. 1983)). The ALJ's depiction of the claimant's limitations must be "accurate, detailed,

and supported by the medical record." Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir.

1999). If the assumptions in the hypothetical are not supported by the record, a VE's opinion

that a claimant can work does not have evidentiary value. Gallant, 753 F.3d at 1456.

        The ALJ's hypothetical did not meet these requirements. As noted above, the ALJ's

hypothetical described an individual who could perform physically "essentially without

limitations except for no exposure to hazards, as far as physical assessment is concerned,"

and who was "capable of remembering, understanding, and carrying out simple one, two,

FINDINGS AND RECOMMENDATION - 29

three-step instructions, maintaining concentration for simple pace routines with regular breaks and supervision, able to get along with coworkers and supervisors, do best without or with limited public contact, able to respond to work changes with no significant limitations." This hypothetical did not include numerous physical and mental limitations assessed by the medical sources discussed above, which the ALJ rejected without proper foundation.

Because the ALJ's hypothetical did not include all of plaintiff's limitations, the VE's testimony that he could perform certain work lacks evidentiary value.


## Conclusion

A judgment should be entered REVERSING the decision of the Commissioner and REMANDING this action to the agency for an award of benefits.


## Scheduling Order

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due May 7 , 2010. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 20th day of April, 2010.


John Jelderks
U.S. Magistrate Judge